1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   MICHAEL STOFF, an individual, on
behalf of himself and all others similarly
12   situated,

13                         Plaintiff,

14   v.

15   WELLS FARGO BANK, N.A., a
Delaware corporation; and DOES 1
16   through 10,

17                         Defendant.

18
19
20
21
22
23
24
25
26
27
28

)   Case No.:  3:21-cv-00793-BEN-KSC
)
)   **ORDER:**
)
)   **(1) DENYING *WITHOUT***
)        ***PREJUDICE* DEFENDANT'S**
)        **MOTION TO STRIKE, OR IN**
)        **THE ALTERNATIVE, DISMISS**
)        **THE CLASS ALLEGATIONS IN**
)        **PLAINTIFF'S SECOND**
)        **AMENDED COMPLAINT;**
)
)   **(2) DENYING *WITHOUT***
)        ***PREJUDICE* MOTION TO**
)        **DISMISS PLAINTIFF'S**
)        **SECOND AMENDED**
)        **COMPLAINT;**
)
)   **(3) GRANTING PLAINTIFF'S**
)        **MOTION FOR REMAND; and**
)
)   **(4) DENYING *WITHOUT***
)        ***PREJUDICE* REQUESTS FOR**
)        **JUDICIAL NOTICE**
)
)   **[ECF Nos. 3, 4, 12, 15, 16, 18, 19, 20,**
)   **22]**
)

-1-

## I.   **INTRODUCTION**

Plaintiff Michael Stoff, an individual, and on behalf of himself and all others similarly situated ("Plaintiff"), brings this action against Defendant Wells Fargo Bank, N.A., a Delaware corporation ("Defendant") alleging violations of California's Consumer Credit Reporting Agencies Act, CAL. CIV. CODE § 1785.1 *et seq.* (the "CCRAA").  ECF No. 1-2.

Before the Court are the following motions: (1) Defendant's Motion to Dismiss the Second Amended Complaint (the "SAC"), ECF No. 3; (2) Defendant's Motion to Strike the SAC, ECF No. 4; (3) Defendant's Request for Judicial Notice, ECF No. 5; and (4) Plaintiff's Motion to Remand to State Court, ECF No. 12.  The Motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  ECF Nos. 21, 22.

After considering the papers submitted, supporting documentation, and applicable law, the Court (1) **GRANTS** Plaintiff's Motion to Remand, ECF No. 12; (2) **DENIES** *without prejudice* Defendant's Motion to Dismiss the SAC, ECF No. 3; (3) **DENIES** *without prejudice* Defendant's Motion to Strike the SAC, ECF No. 4; (4) **DENIES** both parties' requests for judicial notice, ECF Nos. 5, 12.

## II.   **BACKGROUND**

### A.   **Statement of Facts**

Plaintiff alleges that "[h]e is an investor and entrepreneur and . . . relies on his credit, borrowing ability and cash flow for the deals in which he is involved, including real estate endeavors."  SAC, ECF No. 1-2 at 142:3-4.  He alleges that he "is a 'consumer' as defined by Cal. Civ. Code § 1785.3(b)."  *Id.* at 142:8.  He further pleads on that in 2015, he obtained a mortgage from Defendant for the purchase of a single-family home in the city and county of San Diego, California (the "Mortgage").  *Id.* at 142:9-10, 148:22-24.  "Since that time, Wells Fargo has continued to service Plaintiff's mortgage," which "is federally backed by Freddie Mac and now owned by that entity."  *Id.* at 142:10-11.  As the mortgage servicing agent, Defendant has routinely reported the loan status of Plaintiff's mortgage to the major

credit reporting agencies including Experian, Equifax, and TransUnion since the beginning of the mortgage. *Id.* at 142:11-14.

In March 2020, Plaintiff and his wife were looking to buy a new home and seeking a mortgage to finance the purchase. SAC, ECF No. 1-2 at 148:15-17. Plaintiff pleads that he and his wife's credit score, as well as the contents of any consumer report provided by a credit reporting agency ("CRA") to a potential lender "were necessarily an important aspect of the home-buying process." *Id.* at 148:17-19. He alleges that "[t]he higher the credit score, and the more favorable the consumer report, the more likely a consumer is to qualify for a mortgage and to obtain a more favorable interest rate on that mortgage." *Id.* at 148:19-21.

In early April 2020, following the COVID-19 pandemic, he requested and received a three (3) month forbearance of his mortgage obligations under the Coronavirus Aid, Relief, and Economic Security Act, 15 U.S.C. § 9001, *et seq.* (the "CARES Act").[1] SAC, ECF No. 1-2 at 140:23-25, 142:9-14. At the time of this request, Plaintiff alleges he was current on his Mortgage, meaning that even if Defendant granted the request, and Plaintiff suspended his Mortgage payments, Defendant would be required to continue reporting Plaintiff's mortgage as current. *Id.* at 149:7-9. Despite his forbearance request, Plaintiff alleges that "rather than report the Mortgage as 'current[,]' [Defendant] added a 'comment code' that the industry recognizes to signify that the loan is 'in forbearance.'" *Id.* at 149:10-19.

Plaintiff alleges that "[i]n early May 2020, [he] received an email from the credit monitoring service, Credit Karma, notifying him that his credit score had fallen nearly 40 points." Initial Complaint, ECF No. 1-2 at 7, ¶ 37; SAC, ECF No. 1-2 at 149:15-16.

---

[1]   Section 4021 of the CARES Act amends section 623(a)(1) of the Fair Credit Reporting Act (the "FCRA"), *see* 15 U.S.C. §§ 1681s-2(a)(1) by adding subdivision "F" governing "Reporting Information during COVID-19 Pandemic." Other provisions of the CARES Act, including but not limited to sections 4022 and 4023, require mortgage servicers to grant forbearance requests for individuals experiencing financial hardship due to the COVID-19 pandemic. *See* 15 U.S.C. §§ 9056-9057.

"Fearful of how that would affect his ability to obtain a new mortgage and other consumer loans in the future, and the higher interest rates and fees he would be required to pay for such loans (such as a credit card, refinance, or other consumer credit instruments), [Plaintiff] pulled a copy of his Equifax credit report." *Id.* at 149:16-19. "He then discovered that Wells Fargo violated the CARES Act's reporting requirements by reporting that his Mortgage was 'in forbearance' rather than 'current," which he alleges "negatively and materially impacted his credit score with CreditKarma." *Id.* at 149:20-22.

Plaintiff alleges that "[a]s a direct and proximate result of Wells Fargo's misconduct, Plaintiff lost the ability to obtain a penalty-free forbearance on his Mortgage and paid his Mortgage for at least 3 months and potentially as many as 12 months when he should have been entitled to avoid those mortgage payments without penalty." *Id.* at 150:3-6. He further pleads that "Defendant's misconduct negatively affected his ability to obtain credit, including requiring him to agree to and pay higher rates and fees required by lenders in order for Mr. Stoff to obtain credit going forward." ECF No. 1-2 at 142:5-7. Additionally, he incurred more than $300.00 in legal expenses. *Id.* at 149:23-25.

The Fair Credit Reporting Act prohibits a person from "furnish[ing] any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A). The CARES Act Amendment defines an "accommodation" as "an agreement to defer 1 or more payments, make a partial payment, forbear any delinquent amounts, modify a loan or contract, or any other assistance or relief granted to a consumer who is affected by the coronavirus disease 2019 (COVID-19) pandemic" from January 31, 2020 through the later of 120 days after March 27, 2020 or "the date on which the national emergency concerning . . . COVID-19 . . . terminates." 15 U.S.C. § 1681s-2(a)(1)(F)(i)(I)-(II). It further provides that "if a furnisher makes an accommodation with respect to 1 or more payments on a credit obligation or account of a consumer, and the consumer makes the payments or is not required to make 1 or more payments pursuant to the accommodation, the furnisher shall . . . . report the credit obligation or account as current."

15 U.S.C. § 1681s-2(a)(1)(F)(ii)(I).

### B. Procedural History

On June 18, 2020, Plaintiff filed his original complaint against Defendant, commencing *Michael Stoff v. Wells Fargo Bank, N.A. and DOES 1-10*, San Diego Superior Court Case No. 37-2020-00020808-CU-BTCTL (the "State Court Action"). ECF No. 1-2 at 2-13 (the "Initial Complaint"). On June 24, 2020, Plaintiff served Defendant with the Summons and Initial Complaint. ECF No. 12-1 at 9:17-18.

On August 24, 2020, Defendant filed a demurrer to the complaint, which the San Diego Superior Court sustained on January 8, 2021, while granting leave to amend. ECF No. 1-2 at 24, 165; ECF No. 12-1 at 9:17-19; ECF No. 18 at 9:12-13. Accordingly, on January 19, 2021, Plaintiff filed a First Amended Complaint (the "FAC"). ECF No. 1-2 at 97; ECF No. 18 at 9:13-14. On February 22, 2021, Defendant filed a Demurrer to the FAC as well. ECF No. 1-2 at 110; ECF No. 18 at 9:21. Instead of opposing the demurrer, on March 23, 2021, Plaintiff filed the operative Second Amended Class Action Complaint (the "SAC") for Damages.[2] ECF No. 1-2 at 139; ECF No. 18 at 9:21-22.

On April 22, 2021, before responding to the SAC, Defendant removed the case to federal court under the Class Action Fairness Act, pursuant to 28 U.S.C. §§ 1441(a), 1446, and 1453(b). ECF No. 1 at 3, ¶ 7. Shortly thereafter, on April 29, 2021, Defendant filed a Motion to Dismiss Plaintiff's SAC, ECF No. 3, and Strike the Nationwide Class Allegations in Paragraph 62 of the SAC, ECF No. 4, both of which are scheduled to be heard on June 14, 2021 at 10:30 a.m. ECF No. 13 at 2, ¶ 5. That same day, Defendant also filed a Request for Judicial Notice. ECF No. 5. On May 31, 2021, Plaintiff filed an Opposition to the Motion to Dismiss, ECF No. 15; Motion to Strike, ECF No. 16; and

---

[2]     California Code of Civil Procedure section 472(a) allows a party to "amend its pleading once without leave of the court at any time . . . after a demurrer is filed but before the demurrer is heard if the amended complaint . . . is filed and served no later than the date for filing an opposition to the demurrer." Here, the hearing date on the demurrer to the FAC was scheduled for July 23, 2021 at 11:00 a.m., meaning the deadline to oppose the demurrer was nine (9) court days before the hearing.

Request for Judicial Notice, ECF No. 17.  On June 7, 2021, Defendant replied.  *See* ECF Nos. 19, 20.

On May 21, 2021, Plaintiff filed a Motion to Remand pursuant to 28 U.S.C. §1447(c).  Motion, ECF No. 12-1 ("Mot.").  On June 7, 2021, Defendant opposed.  Opposition, ECF No. 18 ("Oppo.").  On June 14, 2021, Plaintiff replied.  Reply, ECF No. 22 ("Reply").

On October 20, 2021, Plaintiff also filed a Notice of Recent Decision.  ECF No.24.  However, on October 21, 2021, Defendant filed an Objection to Plaintiff's Notice of Recent Decision.  ECF No. 25.

## III.   LEGAL STANDARD[3]

Federal courts are courts of limited jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Consequently, district courts are presumed to lack jurisdiction unless the Constitution or a statute expressly provides otherwise.  *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).  .  Generally, federal subject matter jurisdiction exists due to the presence of a federal question, *see* 28 U.S.C. § 1331, or complete diversity between the parties, *see* 28 U.S.C. § 1332.  As pertains to this case, the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453(b) (the "CAFA"),[4] "'relaxed' the diversity requirements for putative class actions." *Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 850 (9th Cir. 2020) (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84 (2014)).  CAFA confers jurisdiction to

---

[3]   Because, as outlined below, the Court determines that it must address the jurisdictional issues first, and upon doing so, should remand the case and refrain from deciding the co-pending motions to dismiss and strike, the Court only addresses the legal standard for a motion to remand.

[4]   CAFA jurisdiction contains a "homestate exception," which requires federal courts to decline exercising federal jurisdiction where the case involves where the case involves a proposed class where greater than two-thirds of that proposed class and the primary defendant are citizens of the State in which the action was originally filed.  28 U.S.C. § 1332(d)(4).  Here, because the parties agree Defendant is not a citizen of California, this exception to jurisdiction under the CAFA does not apply.

district courts in any civil action where (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, *see* 28 U.S.C. § 1332(d)(2)(A); (2) the proposed class consists of more than 100 members, *see id.* § 1332(d)(5)(B); and (3) "the parties are minimally diverse, *i.e.*, any member of a class of plaintiffs is a citizen of a state different from that of any defendant," *see id.* § 1332(d)(2)(A).  *Id.*

Where a case is filed in state court but qualifies as a case over which the federal court has original jurisdiction, a defendant may remove that case to federal court.  28 U.S.C. § 1441(a).  Removal can be accomplished through two routes.[5]  First, if an initial pleading or summons demonstrates a plausible basis for federal jurisdiction, removal must occur within thirty (30) days of receipt of that initial complaint or summons.  28 U.S.C. § 1446(b)(1).  Second, where the initial pleading does not demonstrate a plausible basis for federal jurisdiction, the defendant may remove the case within thirty (30) days of receiving a subsequent document—whether an amended pleading, motion, order, discovery request, discovery response, or "other paper"—"from which it may first be ascertained that the case … has become removable."  28 U.S.C. § 1446(b)(3); *see also Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1124 (9th Cir. 2013).  In determining whether a pleading makes it ascertainable that federal jurisdiction exists so as to trigger one of the thirty (30) day deadlines, "defendants need not make extrapolations or engage in guesswork."

_____

[5]     Normally, where removal is based on a subsequent document (*i.e.*, anything other than the initial complaint), an additional "outside deadline" applies, pursuant to which the "case may not be removed … more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C. § 1446(c). "However, in a CAFA case, there is no such time limit." *Roth*, 720 F.3d at 1124. This is because the CAFA expressly provides that "[a] class action may be removed to a district court of the United States in accordance with section 1446 (*except that the 1-year limitation under section 1446(c)(1) shall not apply*), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants." 28 U.S.C. § 1453(b) (emphasis added). Thus, "[a] CAFA case may be removed at any time, provided that neither of the two thirty-day periods under § 1446(b)(1) and (b)(3) has been triggered." *Roth*, 720 F.3d at 1126 (citing 28 U.S.C. 1453(b)).

*Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1140 (9th Cir. 2013). Despite this, the statute does require "a defendant to apply a reasonable amount of intelligence in ascertaining removability." *Id.* (quoting *Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 206 (2d Cir. 2001)). "Multiplying figures clearly stated in a complaint is an aspect of that duty." *Id.* (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 884 (9th Cir. 2010) (affirming the judgment of the district court denying a motion to remand where the defendant "maintained that its notice of removal was timely because it did not become aware that the case met the requirement until Carvalho revealed in her depositions on February 6 and March 4, 2008, that the amount in controversy was at least $12.5 million (*i.e.,* $25,000 times 500 potential plaintiffs)")).

When removing a case, the notice of removal must contain "a short and plain statement of the grounds for removal." 28 U.S.C. § 1146(a). Consequently, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 574 U.S. at 89. "Evidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation." *Id.* "In determining the amount in controversy, courts first look to the complaint." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). In doing so, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289 (1938) (footnote omitted). "Whether damages are unstated in a complaint, or, in the defendant's view are understated, the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." *Ibarra*, 775 F.3d at 1197 (citing *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 981 (9th Cir. 2013)); *see also Ramirez v. Carefusion Res., LLC*, No. 18-CV-2852-BEN-MSB, 2019 WL 2897902, at *4 (S.D. Cal. July 5, 2019) (noting that "in light of what is at stake in the litigation, a 100% violation rate assumption—that every wage statement during the one-year period violated § 226—is not unreasonable").

Removing a case does not deprive another party "of his right to move to remand the case." 28 U.S.C. § 1448. "Once a defendant has filed a notice of removal in the federal district court, a plaintiff objecting to removal 'on the basis of any defect in removal procedure' may, within 30 days, file a motion asking the district court to remand the case to state court." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 69 (1996) (citing 28 U.S.C. § 1447(c)).

Although normally, courts strictly construe the removal statute against removal jurisdiction, s*ee Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1087 (9th Cir. 2009), "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court," *Dart Cherokee*, 574 U.S. at 89. Further, "[a] defendant seeking removal has the burden to establish that removal is proper." *Luther v. Countrywide Home Loans Servicing, LP*, 533 F.3d 1031, 1034 (9th Cir. 2008). "Any doubt about the right of removal requires resolution in favor of remand." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009).

## IV.   DISCUSSION

The Ninth Circuit has held that because federal courts possess limited jurisdiction while the jurisdiction of state courts is "not so limited, . . . [n]o motion, timely or otherwise, is necessary" for district courts to remand when they lack jurisdiction. *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016); *see also* 28 U.S.C. § 1447 (requiring district courts to remand a case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction"). Thus, "federal courts normally must resolve questions of subject matter jurisdiction before reaching other threshold issues." *Potter v. Hughes*, 546 F.3d 1051, 1061 (9th Cir. 2008) (citing *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 436 (2007)). However, the Supreme Court has given district courts discretion to resolve other issues before a jurisdictional issue where resolving a jurisdictional issue first might prove burdensome. *Sinochem*, 549 U.S. at 425. Here, although Defendant filed its motions before Plaintiff's Motion to Remand, the Court

considers Plaintiff's motion first because if the Court lacks jurisdiction, it also lacks the authority to decide Defendant's motions to dismiss and strike. *See, e.g.*, *H.R. ex rel. Reuter v. Medtronic, Inc.*, 996 F. Supp. 2d 671, 675 n.2 (S.D. Ohio 2014) (noting that the plaintiff's "motion to remand must be resolved before the motion to dismiss, because if remand is appropriate, then the state court should decide the motion to dismiss").

As outlined below, because the Court determines that Defendant failed to timely remove this matter, it must remand this case. Having determined that it must **GRANT** Plaintiff's Motion to Remand, the Court **DENIES** Defendant's motions to dismiss and strike the SAC *without prejudice* given it lacks jurisdiction to rule on those issues. Further, because the Court did not need to take judicial notice of any documents to decide Plaintiff's Motion to Remand, it **DENIES** Plaintiff's Request for Judicial Notice. Similarly, because Defendant's Request for Judicial Notice was submitted in support of Defendant's motions, which the Court is denying *without prejudice*, the Court **DENIES** Defendant's Request for Judicial Notice. Finally, Plaintiff submitted a Notice of Recent Decision, to which Defendant objected, but because this filing had no impact on the Court's ruling and was not considered, the Court disregards this filing.

A.   **Motion to Remand**

Plaintiff argues that the Court should remand this case because Defendant failed to timely remove this case within 30 days of receipt of the Initial Complaint despite having notice the case was removable under the CAFA.[6] Mot. at 5:2-9, 13:9-15. He contends that even though the Initial Complaint pled a basis to remove the case, Defendant waited

---

[6] Alternatively, Plaintiff contends that even if Defendant could not ascertain from the Initial Complaint that this case qualified for removal, other documents within Defendant's possession—such as Plaintiff's September 17, 2020 discovery requests and Defendant's responses thereto as well as Defendant's February 23, 2021 Form 10-K filing with the Securities Exchange Commission—revealed that this case qualified for removal. Mot. at 19:20-21:18. Defendant opposes this argument by contending these documents fail to qualify as "other papers" under the removal statute, and even if they did, they did not reveal a basis for removal. Oppo. at 12:14-17:1. The Court need not address whether these other documents can or did demonstrate a basis for removal given its conclusion that the Initial Complaint demonstrated a basis for removal.

ten (10) months to do so.  Mot. at 5:2-9, 13:9-15.  In its Opposition, Defendant concedes that "[t]he Initial Complaint met CAFA's requirements of (1) minimal diversity and (2) a proposed class of at least 100 members."  Oppo. at 10:10-11.  However, Defendant opposes by arguing that "contrary to Stoff's arguments, the four corners of the Initial Complaint did <u>not</u> place more than $5,000,000.00 in controversy."  *Id.* at 10:11-14 (citing *Kuxhausen*, 707 F.3d at 1139 (citing 28 U.S.C. § 1332(d)) (elements for CAFA removal)). Defendant argues that the Initial Complaint (1) "alleged a class consisting of '***hundreds***, if not thousands' of persons"; (2) "sought to include in the proposed class certain borrowers whose mortgage loans were reported to '*a* credit reporting agency'—singular— in alleged violation of the CCRAA"[7]; (3) failed to allege Plaintiff "sought to recover $5,000 for ***multiple statutory violations*** on behalf of each proposed class member"; and (4) "far from alleging three months' worth of violations 'based on the [purported] CARES Act forbearance range of 3 to 12 months,'" only pled that Plaintiff "had a forbearance for *one* month before discovering the alleged inaccurate credit reporting on which he bases his suit."  *Id.* at 11:2-27 (citing Initial Complaint, ECF No. 1-2 at 5-8, ¶¶ 21, 37-39, 42-43).  Based upon these arguments, Defendant contends that "[t]he Initial Complaint thus only put $1,000,000 in statutory damages in controversy (calculated as 200 class members, multiplied by one violation, multiplied by $5,000 in statutory damages under the CCRAA), $4,000,000 shy of CAFA's amount in controversy requirement."  *Id.* at 11:28-12:4 (citing *Kuxhausen*, 707 F.3d at 1140 (holding "'hundreds,' by definition, means at least 200")) (citations omitted).

In his reply brief, Plaintiff points out that (1) Defendant incorrectly applies the minimum number of class members but the maximum amount of penalties, Reply at 11:21-26, (2) his Initial Complaint not only alleged that "Defendant reported his current

---

[7]  Contrary to Defendant's argument, Plaintiff's Initial Complaint alleges that "[u]pon information and belief," Defendant "furnished incomplete or inaccurate information to Experian Information Solutions, Inc. … that the mortgage was in forbearance" as well as to Trans Union, LLC and Equifax, Inc.  Compl., ECF No. 1-2 at 6, ¶¶ 25, 29, 33.  Thus, the Initial Complaint did allege incorrect information reported to all three CRAs.

mortgage as in forbearance to three separate … CRAs" but also "even identified each CRA by name," Reply at 6:12-14 (citing Initial Complaint ¶¶ 25 – 36); and (3) the Initial Complaint pled that the CARES Act "mandated banks [to] provide mortgage forbearances of up to 360 days," and that Plaintiff "applied for" and later "received a 3-month forbearance of his mortgage obligations" with Defendant, *id.* at 6:14-16 (citing Initial Complaint, ECF No. 1-2 at 3, ¶¶ 2, 21). He elaborates that "[t]he lawsuit was brought on behalf of a class that likely numbered in the thousands, each of whom suffered multiple violations and were entitled to damages of $5,000 per violation—plus attorneys' fees." *Id.* at 7:17-21. Thus, "[w]ithout more, Defendant could have (and should have) 'plausibly alleged' that the amount in controversy had been met based entirely upon the allegations appearing within the 'four corners' of the Initial Complaint." *Id.* at 7:21-8:2. According to him, "[t]he only 'fair reading' of the Initial Complaint is that the maximum recovery for Plaintiff and the class was well in excess of $5,000,000.00 from the get-go." *Id.* at 7:15-18 (citing *Rodriguez*, 728 F.3d at 978-982).

A defendant has 30 days to remove a civil action after receipt of a pleading setting forth the claim for relief upon which a removable action is based. 28 U.S.C. § 1446(b). As stated, the parties agree the Initial Complaint demonstrated minimal diversity and only dispute whether it showed the CAFA's $5 million amount in controversy had been satisfied.    Mot. at 6:10-7:3, 13:23-14:2; Oppo. at 10:10-14. Thus, the issue of whether Defendant timely removed this matter hinges solely on whether Defendant could ascertain the amount in controversy exceeded $5 million based on the Initial Complaint.  In doing so, the Court analyzes whether the Initial Complaint, FAC, and/or SAC demonstrated a basis for removal given (1) each contained varied (albeit similar) allegations and (2) the subsequent complaints could qualify as an amended pleading creating a basis for removal under 28 U.S.C. § 1446(b)(3).  However, all three complaints pled the same categories of damages—actual damages, statutory punitive damages, attorney's fees, and costs—without specifying exact amounts sought for each class member. *See* Initial Complaint, ECF No. 1-2 at 11; FAC, ECF No. 1-1 at 106; SAC, ECF No. 1-2 at 149, 156.

"Where … a plaintiff's state court complaint does not specify a particular amount of damages, the removing [party] bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds the threshold at the time of removal." *Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 849 (9th Cir. 2020) (internal quotations omitted).  The amount in controversy encompasses "all relief a court may grant on that complaint if the plaintiff is victorious." *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 414-15 (9th Cir. 2018).  It "is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability." *Lewis v. Verizon Commc'ns., Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).  Thus, "[i]n measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008).  "The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will *actually* owe." *Id.* (citing *Rippee v. Boston Market Corp.*, 408 F. Supp. 2d 982, 986 (S.D. Cal. 2005); *see also Ramirez v. Carefusion Res., LLC*, No. 18-cv-02852-BEN-MSB, 2019 WL 2897902, at *5 n.3 (S.D. Cal. July 5, 2019) ("[T]o the extent Plaintiff contends the Court cannot assume that she will be successful on her claims for purposes of the amount in controversy requirement, she 'conflates the amount in controversy with the amount of damages ultimately recoverable.'") (quoting *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1203 (9th Cir. 2015).

Because the amount in controversy merely represents a prospective assessment of a defendant's potential (rather than actual) liability, courts have found it appropriate to calculate the amount in controversy by multiplying the maximum number of class members by the maximum amount of penalties. *See, e.g., Rice v. Equifax Info. Servs., LLC*, No. 2:09-cv-07864-PSG-EX, 2010 WL 128369, at *2 (C.D. Cal. Jan. 11, 2010) ("Based upon the alleged maximum penalty for each violation and the alleged number of violations, the Complaint alleges an amount in controversy of $495,000.00, satisfying the amount in controversy requirement for diversity jurisdiction.") (citing *Saulic v. Symantec*

-13-

*Corp.*, No. 07-0610, 2007 WL 5074883, at *9 (C.D. Cal. Dec.26, 2007) (holding that a class action alleging a maximum civil penalty of $1,000 for each class member was removable under the CAFA on the basis of a declaration that the class contained more than 5,001 members)).   A recent Ninth Circuit decision explained the amount in controversy best:

> The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability.  In that sense, **the amount in controversy reflects the *maximum* recovery the plaintiff could reasonably recover**. An assertion that the amount in controversy exceeds the jurisdictional threshold is not defeated merely because it is equally possible that damages might be less than the requisite amount, as the district court reasoned.   Where a removing defendant has shown potential recovery *could* exceed $5 million and the plaintiff has neither acknowledged nor sought to establish that the class recovery is potentially any less, the defendant has borne its burden to show the amount in controversy exceeds $5 million.

*Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019) (internal quotations and citations omitted and emphasis added).  Accordingly, the Court must use a class size multiplier of at least 1,000 class members.

Having established that the amount in controversy encompasses "all relief a court may grant on that complaint if the plaintiff is victorious," *Chavez*, 888 F.3d at 414-15, this Court must evaluate whether, based upon the number of violations per class member, class size, and statutory penalties, Defendant should have been able to ascertain removability based upon the Initial Complaint.  This decision ends up hinging on the meaning of two words: "if not."  If "if not" means "or," then, by stating "hundreds, if not thousands," the class definition meant "hundreds, or thousands."

The Court was unable to locate a case directly discusses the meaning of the idiom "if not."  However, courts may look to the dictionary definition of a word, or in this case, idiom, to help determine the plain meaning of the phrase or word. *See, e.g.*, *Niz-Chavez v.*

-14-

*Garland*, 141 S. Ct. 1474, 1484-85 (2021) (noting that "in the process of discerning … meaning," courts may "consult grammar and dictionary definitions—along with statutory structure and history … because the rules that govern language often inform how ordinary people understand the rules that govern them").  There appear to be multiple definitions of the idiom "if not" as it can be used in a variety of contexts.  For example, the Free Dictionary and Vocabulary.com define "if not" as an adverb that indicates the "possibility of being more remarkable (greater or better or sooner) than."   https://www. thefreedictionary.com/if+not;  https://www.vocabulary.com/dictionary/if%_20not.   They use the example "will yield 10% if not more" as meaning that something will yield at least 10% but possibly more.  *Id.*  Taking this into consideration, this Court finds that "if not" means "or," and "or" is "almost always disjunctive" (*i.e.*, meaning one or the other).  Consequently, "hundreds, if not thousands" means "hundreds or thousands."   Because the Court determines the amount in controversy as a "worst case scenario" of damages, *see Arias*, 936 F.3d at 927, it must use the higher number of "thousands," which means at least 2,000, *Kuxhausen*, 707 F.3d at 1140.  Having established the meaning of "if not," the Court continues its analysis.

### 1.   *Number of Violations per Class Member*

Plaintiff argues that "[i]n order to attempt to justify its untimely removal, Defendant misrepresents the damages sought in this case, as stated in the Initial Complaint."  Mot. at 16:5-8.  Defendant's notice of removal acknowledges that the SAC seeks "up to $5,000 for each of the alleged thousands of class members."  *See* NOR, ECF No. 1 at 3, ¶ 7 (citing SAC, ECF No. 1-2 at 18, prayer); Mot. at 16:5-8 (citing same).  Plaintiff contends that these calculations, which seek damages of $5,000.00 per class member, "vastly underestimate" the amount of damages Plaintiff seeks because he seeks $5,000.00 for "each violation," not "each class member," as each class member likely experienced multiple violations.  Mot. at 16:8-11.  Plaintiff points out that "[b]ecause Defendant reported a class member's loan status each month during the forbearance period, each time it did so [Defendant] violated the statute."  *Id.* at 16:11-12.  Thus, he argues that "because

-15-

each forbearance was for a term of at least three months and potentially as many as 12 months and [was reported] to three different [CRAs], each class member is potentially entitled to damages for as many as 36 separate and distinct violations."[8] Mot. at 16:13-18 (citing ECF No. 1-2 at ¶ 2 ("The CARES Act, in part, mandated banks provide mortgage forbearances of up to 360 days for individuals who may suffer negative economic effects due to the pandemic.")).  According to Plaintiff, "[t]hese allegations were the same in the Initial Complaint," which sought "at least $100 and not more than $5,000 *for each violation*," as in the SAC."  *Id.* at 16:18-22.  Defendant responds that it could not ascertain removability from the Initial Complaint because "the Initial Complaint *nowhere* alleges multiple violations per class member."  Oppo. at 11:14-15.

The Initial Complaint[9] contains no allegations as to how many months the violations occurred.  Despite this, the number of months of violations is derived from the statute itself.  The CARES Act defines the "duration of the forbearance" as "granted for up to 180 days [6 months] ... and … extended for an additional period of up to 180 days at the request of the borrower."  15 U.S.C. § 9056(b)(2).  Thus, an individual can potentially receive a forbearance of up to one year.  *See id.*  Another provision of the CARES Act, which amended the FCRA, defines the term "covered period" as beginning on January 31, 2020 and ending on the later date of either March 27, 2020, or "120 days after the date on which the national emergency concerning the novel coronavirus disease (COVID-19) outbreak declared by the President on March 13, 2020 under the National Emergencies Act (50 U.S.C. 1601 *et seq.*) terminates."  15 U.S.C. § 1681s-2(a)(1)(F)(i)(II); *see also* 50 § U.S.C. 1622(d) (providing that "[a]ny national emergency declared by the President …

---

[8]     The 36 violations arise out of 3 violations per month (if the Court allows Plaintiff to recover for each time Defendant misreported information to each separate CRA) multiplied by 12 (the potential months the violations occurred).

[9]     Plaintiff's FAC alleged that "[a]s a direct and proximate result of [Defendant]'s misconduct, Plaintiff lost the ability to obtain a penalty-free forbearance on his mortgage and paid his mortgage for at least 3 months and potentially as many as 12 months when he should have been entitled to avoid those mortgage payments without penalty."  ECF No. 1-2 at 102, ¶ 40.

and not otherwise previously terminated, shall terminate on the anniversary of the declaration of that emergency").

The resolution of the issue of whether Plaintiff, or any other class member, could recover multiple violations for the same conduct, solely because the wrong information was reported to all three different CRAs or was misreported each month for three to twelve months is not clear to the Court. *Compare Kincaid v. Equifax Information Services, LLC*, No. 2:20-cv-04033-DSF-KSX, 2020 WL 12188062, at *4 (C.D. Cal. Aug. 3, 2020) ("For the reasons stated above, the Court disagrees with the district court's conclusion that the transmission of an incorrect credit report by a <u>CRA</u> triggers a new FCRA violation[10] by the <u>credit furnisher</u>.") (original emphasis); *Williams v. LVNV Funding, LLC*, No. 4:15-CV-2219-KOB, 2017 WL 1331014, at *1 (N.D. Ala. Apr. 11, 2017) (holding that even though the plaintiff was "correct that each violation of the FCRA is a separate violation," he was "not entitled to recover for the same *injury*, even if two different violations could be said to have caused that injury" because even though his claims against the CRAs stemmed from separate conduct, "the relevant inquiry … is not whether the *conduct* is distinct but whether the *injury* is distinct") *with Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 501 (4th Cir. 2007) (allowing recovery for multiple violations because the plaintiff had separate interactions with all three CRAs, and "each agency produced reports with different inaccuracies, and each agency either corrected or exacerbated these mistakes independently of the others" causing "discrete injuries independent of those caused by the other credit reporting agencies").

The Court finds that (1) the Initial Complaint alleged a potential class of "hundreds, if not thousands," Initial Complaint, ECF No. 1-2 at 8, ¶ 43; (2) the Initial Complaint pled that Plaintiff's information was reported incorrectly to all three CRAs, *id.* at 6, ¶¶ 25-33;

---

[10]    Although this case involves the CCRAA, and not the FCRA, because the CCRAA is substantially based on the FCRA, "judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions." *Olson v. Six Rivers Nat'l Bank*, 111 Cal. App. 4th 1, 12 (2003) (citing *Kahn v. Kahn*, 68 Cal.App.3d 372, 387 (1977)).

-17-

(3) although the Initial Complaint did not explicitly allege each class member was entitled to recover $5,000.00 for multiple violations per class member, that issue is an issue of law, and the Court can determine that by reference to the applicable statutes; and (4) even though the Initial Complaint alleges a forbearance of only one month before discovery of the allegedly inaccurate reporting information, if Defendant continued to report that information incorrectly in future months, additional violations might be appropriate. However, the Court evaluates whether the Initial Complaint satisfied the amount in controversy requirement based on one violation per class member because whether multiple violations per class member is authorized in this case is an issue of fact not readily clear to the Court at this stage of litigation. Further, as set forth below, the Court need not assume multiple violations per class member given one violation per class member can still satisfy the amount in controversy.

### 2. *Amount of Damages*

Plaintiff argues that "[u]sing $5,000.00 per violation as the basis for calculating class-wide damages, it would require 1,000 violations to reach CAFA's threshold of $5,000,000.00." Mot. at 15:14-16. With his assumption of "the minimum of 3 violations per class member (based on the CARES Act forbearance range of 3 months to 12 months), and the fact that Defendant reported the forbearance to at least three different Credit Reporting Agencies (Initial Complaint at ¶¶ 25-36), there would only need to be 112 class members (in addition to Plaintiff) to overcome the $5,000,000.00 threshold of CAFA." Mot. at 15:16-21. Defendant responds that "[t]his theory involves [Plaintiff] 'assuming' three months' worth of reporting in violation of the CCRAA, along with imposition of a $5,000 penalty per month across each of the three credit reporting agencies [Defendant] furnishes information to (112 [class members] x $5,000 [penalty] x 3 months [penalty duration] x 3 [# of ] CRAs = $5,040,000)." Oppo. at 11:10-14 (citing Mot. at 15). However, Defendant argues "[t]he Initial Complaint … did not specify the total amount of

-18-

damages sought on behalf of the proposed class,"[11] and "[i]nstead, … vaguely sought 'actual damages, *if any*,' along with 'statutory and punitive damages … in the amount of at least $100 and not more than $5,000 for each violation[.]'" *Id.* at 10:24-28 (citing Initial Complaint, at Prayer for Relief (emphasis added)).  As the Court has already determined that it will not consider multiple violations per class member, it disregards Plaintiff's calculations which rely upon multiple violations per class member.

Plaintiff sues under California Civil Code section § 1785.25(a) of the CCRAA, which prohibits a person from furnishing "information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." *See* Initial Complaint, ECF No. 1-2 at 9-10, ¶ 54.  Plaintiff pursues damages for violation of California Civil Code section 1785.31, which sets forth damages as a result of a violation of any provision of that title, including section 1785.25(a).[12]  *Id.* at 11, ¶ d.  In opposing remand, Defendant argues that "the Initial Complaint nowhere alleged the amount [Plaintiff] otherwise sought to recover for purported 'actual damages' or attorneys' fees, much less that such amounts—even if combined with statutory damages—somehow met CAFA's amount in controversy requirement." Oppo. at 11:5-8.  Thus, Defendant argues that it "was therefore not required

---

[11]   The Court notes that the SAC, like the Initial Complaint, also did not "specify the total amount of damages sought," yet, Defendant still found removal appropriate on the basis of the SAC.  Thus, the Court rejects this argument as creating a basis to argue that removal was not ascertainable based on the Initial Complaint.

[12]   Although certain provisions of the CCRAA are preempted by the FCRA, the Ninth Circuit has expressly held that the damages provisions at issue in this case, namely CAL. CIV. CODE § 1785.31, are not preempted by the FCRA.  *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1173 (9th Cir. 2009); *see also Oya v. Wells Fargo Bank, N.A.*, No. 3:18-CV-01999-H-BGS, 2018 WL 5761486, at *4 (S.D. Cal. Nov. 2, 2018) (Huff, J.) (holding that the same provisions are not preempted by the FCRA); 15 U.S.C. § 1681t(b)(1)(F)(ii) (providing that "[n]o requirement or prohibition may be imposed under the laws of any State …. with respect to any subject matter regulated under section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply …. with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996)").

-19-

to remove the Initial Complaint, and its notice of removal was timely." *Id.* at 11:9-13 (citing *Kuxhausen*, 707 F.3d at 1140 (defendant not required to "make extrapolations or engage in guesswork" and need only "multiply[] figures clearly stated in the complaint" to determine removability)).

As to statutory punitive damages, the CCRAA provides that in addition to actual damages, a consumer may recover "[p]unitve damages of not less than one hundred dollars ($100) nor more than five thousand dollars ($5,000) for each violation as the court deems proper." CAL. CIV. CODE § 1785.31(a)(2)(B). Because the Court has established it may use the maximum possible penalties when calculating the amount in controversy, it uses the higher amount of $5,000.00 when calculating whether the Initial Complaint made removability ascertainable.

As to actual damages, the CCRAA provides that "[a]ny consumer who suffers damages as a result of a violation of this title by any person may bring an action in a court of appropriate jurisdiction against that person to recover" actual damages, which include "costs, loss of wages, attorney's fees and, when applicable, pain and suffering." CAL. CIV. CODE § 1785.31(a)(2)(A); *see also Grigoryan v. Experian Info. Sols., Inc.*, 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014) ("Under the CCRAA, Grigoryan can recover actual damages and punitive damages of not less than $100 and not more than $5,000 per willful violation."). The CCRAA requires proof of actual damages for a plaintiff to recover. *See, e.g.*, *Duarte v. J.P. Morgan Chase Bank*, No. 2:13-cv-01105-GHK-MANX, 2014 WL 12561052, at *3 (C.D. Cal. Apr. 7, 2014) (noting that "a plaintiff cannot recover under the CCRAA without proving actual harm"); *see also Trujillo v. First Am. Registry, Inc.*, 157 Cal. App. 4th 628, 638-39 (2007), *disapproved of on other grounds by Connor v. First Student, Inc.*, 5 Cal. 5th 1026 (2018) ("Because Trujillo and Gradie suffered no actual damage, plaintiffs' CCRAA cause of action fails as a matter of law.").

Here, Plaintiff fails to plead any amounts for actual damages, leaving Defendant and the Court with no basis for calculation for compensatory damages, lost wages, and/or pain and suffering. *See generally* Initial Complaint. However, under the CCRAA, actual

damages include amounts for attorney's fees and costs. While neither party provides information as to incurred costs, the filing fee for a civil complaint in the San Diego Superior Court is set by statute and is $1,435.00 in this case.[13] Further, while neither party provides information as to attorney's fees,[14] as Plaintiff points out, "[f]or more than two decades, the Ninth Circuit has set the 'benchmark for an attorneys' fee award in a successful class action [at] twenty-five percent of the entire common fund.'" *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 519 (N.D. Cal. 2020), *aff'd*, 845 F. App'x 563 (9th Cir. 2021) (quoting *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997)). Additionally, it is well established that courts should consider attorney's fees recoverable by statute when calculating the amount in controversy. *Arias*, 936 F.3d at 922 (citing *Fritsch*, 899 F.3d at 794). Thus, once the Court calculates Plaintiff's total damages, attorney's fees may be calculated as twenty-five percent (25%) of that amount. Plaintiff points out that this means "that in order to reach the $5,000,000 threshold the Initial Complaint need only assert damages in the amount of $4,000,000." Mot. at 16:24-17:6.

In sum, the relevant damages in this case include a penalty of $5,000.00 per class member plus actual damages along with attorney's fees that are twenty-five percent (25%) of those penalties and a one-time cost for a $1,435.00 filing fee.

---

[13] The California Government Code indicates that the applicable filing fee for the San Diego Superior Court at the time Plaintiff filed suit would have been **$1,435.00**. *See* CAL. GOV'T CODE §§ 70611, 70602.5(a), 70602.6, § 70616(e). The Court takes judicial notice, *sua sponte*, of the fact that the California Government Code sets a filing fee of **$1,435.00** for a complex civil unlimited case. *See* FED. R. EVID. 201(b)(1)-(2) (providing that at any stage of a proceeding, courts may take judicial notice of (1) facts not subject to reasonable dispute and "generally known within the trial court's territorial jurisdiction" and (2) adjudicative facts, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[14] Plaintiff's FAC, but not his Initial Complaint, indicates he incurred more than $300.00 in legal expenses. ECF No. 1-2 at 149:23-25. Because Plaintiff provided no evidence as to these costs, and the Court examines whether removability could be ascertained from the Initial Complaint, it does not take this amount into consideration.

-21-

### 3. *Class Size and Definition*

Plaintiff argues that the Initial Complaint put Defendant on notice that CAFA's $5 million amount in controversy requirement was triggered because the class definition, like the class definition of the SAC, alleged the class consisted of "hundreds, if not thousands" of class members. Mot. at 15:5-12. Defendant responds that on the contrary, the Initial Complaint, "far from putting in controversy over $5,000,000, … plead a class of zero persons" because it limited itself to "borrowers 'in the State of California whose accounts were current, who received a forbearance after March 27, 2020, and whose account was not reported as 'current' to a credit reporting agency.'" Oppo. at 10:15-19 (citing Initial Complaint, ¶ 43). Defendant argues that because its "policy was to report loans in forbearance as 'current' where the loans were in fact current," no loans could have been reported as "not current."[15] *Id.* at 10:20-22, 14:28, 15:27-28. In other words, because its policy was to report loans in forbearance as current (rather than reporting them as "in forbearance"), there can be no violations creating a class. *Id.* Further, Defendant also points out that "the Initial Complaint alleged a class consisting of '***hundreds***, if not thousands' of persons." *Id.* at 11:18-22 (citing Initial Complaint at ¶¶ 42-43 (emphasis added)). Plaintiff concedes that if the Court used a minimum possible recovery of a class size of hundreds coupled with potential damages of $100.00 per class member, this case would not have been removable. Reply at 8:26-28.

Defendant argues that it was not until the SAC "sought to represent a ***nationwide***

---

[15] Defendant argues that Plaintiff likely amended his class allegations in response to this information revealed during discovery. Oppo. at 10:22-23. However, the issue of whether the class is a class of zero due to Defendant's policies goes to the merits and heart of this case and is not appropriate for determination on a motion to remand, where the Court must assume the truth of the allegations in the complaint. *See, e.g.*, *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987) (noting that in ruling on a motion to remand, a "district court must focus on the plaintiff's complaint at the time the petition for removal was filed" and "assume as true all factual allegations in the complaint") (citing *Green v. Amerada Hess Corp.*, 707 F.2d 201, 205 (5th Cir. 1983), *cert. denied,* 464 U.S. 1039, (1984)). Thus, the Court refrains from ruling on this issue and considers removability based upon a class of "hundreds' if not thousands."

class of persons, rather than only a proposed California class" that it ascertained removability.  Oppo. at 5:2-6, 9:23-27 (emphasis added).  In examining the timeliness of Defendant's removal, the Court examines the class allegations in the Initial Complaint, FAC, and SAC but finds the Initial Complaint and FAC pled a class size "hundreds, if not thousands," while the SAC pled a class of "thousands, if not millions":

|  | Complaint (June 18, 2020): | FAC (January 19, 2021): | SAC (March 23, 2021): |
|---|---|---|---|
| Class: | All mortgagees with a mortgage in the **State of California** whose accounts were current, who received a forbearance after March 27, 2020, and *whose account was not reported as "current" to a credit reporting agency*.  Compl., ECF No. 1-2 at 8, ¶ 43 (emphasis added). | All mortgagees with a mortgage in the **State of California** whose accounts were current, who received a forbearance after March 27, 2020, and *whose account was reported as "in forbearance" (or something similar) to a consumer reporting agency*.  FAC, ECF No. 1-2 at 102, ¶ 45 (emphasis added). | All mortgagees with a mortgage in the **United States of America** whose accounts were current, who received a forbearance on or after March 27, 2020 and *whose account was reported as "in forbearance" (or something similar) by Defendant to a consumer reporting agency*.  SAC, ECF No. 1-2 at 153, ¶ 62 (emphasis added). |
| Numerosity: | Defendant automatically marked hundreds, if not thousands, of mortgages in the state of California as being in "forbearance" rather than "current" as the CARES Act required, in doing so, Defendant violated the CCRAA.  Compl., ECF No. 1-2 at 7-8, ¶ 42. | Defendant automatically marked hundreds, if not thousands, of mortgages in the state of California as being in "forbearance" rather than "current" as the CARES Act required, in doing so, Defendant violated the CCRAA.  FAC, ECF No. 1-2 at 102, ¶ 44. | Using its automated processes, Defendant automatically marked many thousands, if not millions, of current mortgages as being "in forbearance" rather than simply "current" as the CARES Act required, and in doing so, Defendant violated the CCRAA.  SAC, ECF No. 1-2 at 153, ¶ 61. |

Thus, the class size for purposes of calculating the amount in controversy was "hundreds,

-23-

if not thousands" under the first two complaints.

Both parties cite to the case *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136 (9th Cir. 2013) as addressing the issue of a defendant's duty to investigate the amount in controversy as well as whether the Court should use a figure of "hundreds" or "thousands" as a multiplier. Defendant argues that *Kuxhausen* stands for the proposition that "defendants need not make extrapolations or engage in guesswork" to determine removability. Oppo. at 11:15-17. It contends that based on this proposition, it did not need to extrapolate the amount in controversy, nor could it have. *Id.* Plaintiff replies that "Defendant conveniently ignores the next two sentences, in which the Court held the removal statute '***requires*** a defendant to apply a reasonable amount of intelligence in ascertaining removability," and that "[m]ultiplying figures clearly stated in a complaint is an aspect of that duty.'" Reply at 8:13-16 (citing *Kuxhausen*, 707 F.3d at 1140).

*Kuxhausen*, like the present case, addressed the issue of whether a defendant timely removed to federal court. *Id.* at 1137-38. The plaintiff filed a class action complaint asserting ten causes of action and two classes while also pleading—without "specifying a total sum for class-wide damages"—that class members were entitled to statutory damages of $1,000.00 per consumer and $5,000.00 for senior citizen consumers. *Id.* at 1138. Approximately six months later, the plaintiff filed a First Amended Complaint, alleging a new class. *Id.* Upon the filing of that amended complaint, the defendant removed to federal court, arguing that the third class caused the amount in controversy to total more than ten million dollars. *Id.* at 1138-39. The plaintiff moved to remand, arguing removal was untimely as it had been apparent that the case was removable from the original complaint; yet, the defendant failed to remove within thirty days of the original complaint's filing. *Id.* at 1139. The Ninth Circuit held the district court erred by remanding the case. *Id.* at 1143.

First, as to numerosity, the court rejected the defendant's argument that the class number was indeterminate based on its allegations that that the "exact number" of class members was unknown. *Kuxhausen*, 707 F.3d at 1140. On the contrary, the first paragraph of the complaint alleged that it was seeking to provide remedies for "hundreds of affected

customers," and "'hundreds' by definition, means at least 200." *Id.* (citing *Carvalho*, 629 F.3d at 886; *Tompkins v. Basic Research LL,* No. S–08–244 LKK/DAD, 2008 WL 1808316, at *3 (E.D. Cal. Apr. 22, 2008) (CAFA numerosity satisfied because the allegation "a class of 'thousands of persons'" implies "a logical minimum of 2,000 class members")). Second, the *Kuxhausen* court rejected the defendant's arguments that it did not need to make mathematical calculations to evaluate the amount in controversy. *Kuxhausen*, 707 F.3d at 1140. It reasoned that while "defendants need not make extrapolations or engage in guesswork," they do need "to apply a reasonable amount of intelligence in ascertaining removability," and "[m]ultiplying figures clearly stated in a complaint is an aspect f the duty." *Id.* (citing *Carvalho*, 629 F.3d at 884 (noting that the "amount in controversy was at least $12.5 million (*i.e.*, $25,000 times 500 potential plaintiffs")). Third, the court held that where the complaint did not "allege the value, even as an approximation, of other class members' vehicle financing contracts," the defendant did not have a duty to consult its own records to identify a representative valuation. *Id.* at 1140-41. Rather, the defendant "was not obligated to supply information which [the plaintiff] had omitted." *Id.* at 1141.

Plaintiff argues that unlike his Initial Complaint, "in *Kuxhausen*[,] the plaintiff did not allege the amount of damages per violation, or even per class member." Reply at 8:16-18. In this case, however, Plaintiff contends he "provided the necessary information concerning the number of class members, the number of violations per class member, and the damages for each violation." *Id.* at 8:18-20. Thus, "[n]othing more [was] required, and Defendant cannot refuse to do the necessary calculation and claim the class wide damages were somehow 'indeterminate.'" *Id.* at 8:20-22. The Court agrees that while the complaint in this case, like the complaint in *Kuxhausen*, did not state a monetary figure of damages sought per class member or the exact class size, unlike *Kuxhausen*, the amount in controversy depended upon the number of violations and the amount of penalties, but the penalties per violation was fixed by statute. This differs from *Kuxhausen*, where the potential damages, and therefore, the amount in controversy, depended on the amount of

the vehicle finance contracts, and the plaintiff failed to allege the monetary value of the contracts. *Kuxhausen*, 707 F.3d at 1140-41.  Had Defendant merely assumed one violation per class member at the maximum penalty rate of $5,000.00 per violation and a class of 2,000 members, it would have been readily apparent that the amount in controversy could reach $10 million.  In other words, unlike *Kuxhausen*, where remand was improper because the defendant could not have ascertained removability merely by multiplying figures, in this case, had Defendant merely multiplied figures, it could have ascertained removability.

In sum, the Initial Complaint alleges a class size of "hundreds, if not thousands." Initial Complaint at 7-8, ¶ 42.  Based upon *Kuxhausen*, the Court considers the amount in controversy using the lower end thousands figure of at least 2,000.  707 F.3d at 1140.

### 4. *The Initial Complaint's Amount in Controversy*

As shown below, using the minimum penalty amount and class size, the amount in controversy would not have been ascertainable.  However, the law allows courts to calculate the amount in controversy using maximum penalties. *Rice*, 2010 WL 128369, at *2. Thus, having determined that the Initial Complaint revealed an ascertainable class size of at least 2,000 with penalties amounting to $5,000.00, it appears that even with one violation per class member, the Initial Complaint revealed a potential amount in controversy exceeding $10 million.

|  | Minimum Amount: | Maximum Amount: |
|---|---|---|
| Actual Damages, Cal. Civ. Code § 1785.31(a)(2)(A): | None pled | None pled |
| Statutory Damages, Cal. Civ. Code § 1785.31(a)(2)(B): | $100 (minimum penalty) x 200 (minimum class) = **$20,000.00** | $5,000 (maximum penalty) x 2,000 (maximum class) = **$10,000,000.00** |
| Attorney's Fees: | $20,000.00 x 0.25 = **$5,000.00** | $10,000,000.00 x 0.25 = $2,500,000.00 |
| Costs: | $1,435.00 | $1,435.00 |
| Subtotal: | **$25,000.00** | **$12,500,000.00** |

Accordingly, removal was ascertainable from the Initial Complaint.  By removing

only after the filing of the SAC, Defendant failed to timely remove this case.  28 U.S.C. § 1446(b)(1).  On that basis, the Court **GRANTS** Plaintiff's Motion to Remand and orders this case remanded to the San Diego Superior Court.

### C.   Defendant's Motions to Strike and Dismiss the SAC

Defendant seeks to strike the classwide allegations in the SAC, or in the alternative, dismiss them because the SAC alleges a nationwide class, but Defendant argues that the CCRAA does not apply to borrowers outside of California.  ECF No. 4-1.  Defendant also seeks to dismiss the SAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure by arguing that (1) although the FCRA does not require proof of actual damage to recover statutory damages or punitive damages, the CCRAA does require such proof, and (2) Plaintiff's SAC fails to allege actual damages

ECF No. 3-1 at 6:26-8:3.

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem*, 549 U.S. at 430-31.  Here, because the Court determines that the case must be remanded back to state court, it refrains from addressing the merits of Defendant's arguments, which primarily pertain to issues of California Law.  Thus, the Court **DENIES** Defendant's motions *without prejudice*.

### D.   The Parties' Requests for Judicial Notice

Defendant asks the Court to take judicial notice of two documents submitted in support of Defendant's Motion to Strike, or in the Alternative, Strike the Class Allegations in Plaintiff's SAC.  *See* ECF No. 5.  First, it asks the Court to take judicial notice of Plaintiff's Deed of Trust, which secures his home loan with Defendant and was recorded as Doc. No. 2015-0122022 on March 17, 2015, in the Official Records of the San Diego County Recorder.  ECF No. 5 at 3:6-11.  Second, Defendants seeks judicial notice of Freddie Mac's state specific uniform security instruments, available at https://sf.freddiemac.com/tools-learning/uniform-instruments/all-instruments#security-instruments.  *Id.* at 3:12-23.  Plaintiff does not object to judicial notice of the Deed of Trust

-27-

but files numerous objections to the Court taking judicial notice of Freddie Mac's state specific uniform security instruments standards.  *See* ECF No. 17 at 2:4-10.  Because Defendant asks the Court to take judicial notice as part of its Motion to Strike, which the Court has denied without prejudice, the Court also **DENIES** Defendant's Request for Judicial Notice as the Court did not need to consider such documents.

Plaintiff asks the Court to take judicial notice of Defendant's SEC Form 10-K filed by Defendant for Fiscal Year 2020 and signed and filed with the SEC on February 23, 2021.  Mot. at 7:22-8:2.  He notes that such fillings are routinely subject to judicial notice as public records of which the corporation cannot reasonably question the accuracy.  ECF No. 12-2 at 8:10-10; *see also Stadnicki on Behalf of LendingClub Corp. v. Laplanche*, 804 F. App'x 519, 520, n.1 (9th Cir. 2020) (granting the parties' request for judicial notice of the defendant's filings with the SEC).  Because the Court grants Plaintiff's Motion to Remand on the basis of the removability of the Initial Complaint, it did not need to consider whether the case was removable on the basis of other papers.  Thus, it never considered the SEC filings.  As a result, the Court **DENIES** Plaintiff's request for judicial notice.

### E.    Plaintiff's Notice of Recent Decision

Plaintiff submitted a Notice of Recent Decision, attaching the opinion in *Railey v. Sunset Food Mart, Inc.*, 16 F.4th 234, *3-5 (7th Cir. 2021), which held that (1) the defendant-employer timely removed based on minimal diversity after it discovered through its own social media investigation facts showing minimal diversity; (2) the district court correctly remanded a case under the home-state controversy exception to CAFA jurisdiction; and (3) the 30-day removal clock in § 1446(b)(1) began to run when the plaintiff served her complaint.  *See* ECF No. 24.  Defendant objects to Plaintiff's Notice of Recent Decision and asks the Court to strike and refuse to consider the document.  ECF No. 25.  Alternatively, Defendant asks that if the Court is inclined to consider those arguments, that it grant Defendant the opportunity to respond and demonstrate why that decision is inapposite.  ECF No. 25.

Where a party presents new evidence in a reply brief or after the submission of a

reply brief, the district court should decline consideration of the new evidence unless it provides the non-moving party an opportunity to respond to such evidence. *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018). Here, the *Railey* decision is not binding authority on the Court and did not factor into the Court's decision on the Motion to Remand. Thus, the Court disregards Plaintiff's Notice of Recent Decision.

## V.   **CONCLUSION**

For the above reasons, the Court **ORDERS** as follows:

1.   Plaintiff's Motion to Remand, ECF No. 12, is **GRANTED**. The Clerk of the Court shall remand this case to the San Diego Superior Court.

2.   Defendant's (1) Motion to Dismiss the SAC, ECF No. 3; (2) Motion to Strike the Classwide Allegations of SAC, or in the Alternative, Dismiss Those Allegations, ECF No. 4; (3) Request for Judicial Notice, ECF No. 5; and (4) Plaintiff's Request for Judicial Notice are **DENIED** *without prejudice* due to the Court's decision to remand this case to the San Diego Superior Court.

3.   Plaintiff's Notice of Recent Decision is disregarded.

**IT IS SO ORDERED.**

DATED:   November 22, 2021

_____
**HON. ROGER T. BENITEZ**
United States District Judge